Next case called for oral argument is Ohms v. Green. Counsel. May it please the court. Counsel. My name is Daryl Hunt. I'm representing the defendant, Kelly Green. This is basically a construction case where the homeowner, Ms. Ohms, was dissatisfied with virtually all the work that was performed and brought a suit for damages or whatever the costs were, repairs and other damage that were arguably related to contracts. My client, there was actually, it all started when there was some pipes in the ceiling and Ms. Ohms' home had burst and created damages, and my client was not involved in a ceiling repair job. But when the ceiling repair contractor came out there, she apparently made some inquiry about having other work done. That individual did not apparently feel qualified to do the work and brought my client into the job. My client has actually underwent a significant back injury, actually didn't do any of the work himself, but subcontracted it out. There's no question that he signed four separate contracts and he was a signatory and he was basically guaranteeing the work. At the end of the trial, he even testified that he himself lost money on the job. There was like four separate counts that were brought by Ms. Ohms against my client, and all of them were dismissed for failure of proof except for count one, which was basically the breach of contract count. As to many of the damages on the breach of contract count, trial judge apparently reached the conclusion there was failure of proof as to those, but did award damages for three separate items. One was for flooring, other was for cleanup, and then there was a $500 damage award for a kitchen cabinet. I do think on a manifest way to the evidence standard, there is a sufficient evidence on the kitchen cabinet, so I guess what we're asking for is that the appellate court reverse on all the other items except for the $500 on the kitchen cabinet. If you turn to A28 of the record, the trial judge's award is set forth there about three quarters of the way down the page. The trial judge says, based upon the testimony, judgment is entered in favor of plaintiff against defendant in the amount of $6,684.64, which includes cost of flooring, $4,934.64. Cleanup, $1,250, and cabinet repair, $500, which I talked about. Now, my first point I want to make is that I have no idea how the trial judge came up with the $4,934.64. I'm a search director. I've looked at the contracts. I've added them up and subtracted. I just don't see how that number was ever arrived at, and I stated that in my brief. And so I kind of expected that the appellee in their brief would show the math. Now, there is a statement at page 13 of the appellee's brief where just kind of a conclusion statement was made that the trial judge properly awarded this $4,934.64, but doesn't show the math either. So I had to assume that the appellee doesn't even know how that number was arrived at. But I don't know that the court, I don't think the court has to get into reversing for further consideration or anything like that, because I think there was just a total failure of the proof as to the floor. And that's obviously the main item for the reason why we are appealing. The first point I want to make is that there is, there would be, there was a sufficient evidence, it seemed to me, on a manifest plate of the evidence standard that one item on the flooring was where the closet, the flooring, the direction of the flooring in the closet ran contrary to the direction of the flooring in the rest of the room. And Mr. Fortmiller, who was the person that was hired to install the flooring, even testified that that was not a proper installation. There was also some testimony about some molding and some finishing work that on a manifest plate of the evidence standard, the trial judge could have made that finding that that was deficient. But there was no, no evidence whatsoever at any point in time introduced where even in a general statement or a specific statement, okay, how much would it cost to remove that flooring in the closet and have the boards run the correct way? So we have no way of knowing what the damages were for that improper installation. And there can't be, it seems to me, any damages awarded for that when we don't know what they are. The same thing with the finishing work. There were photographs and finishing work and the issues that were complained about. But nowhere in the trial was there any evidence saying, okay, how much would it cost by anybody that had the credentials to do the work to finish this up in a way that was a workable way. Again, there's no evidence on which the trial court could have awarded any damages based on that. And so I have to conclude that in this $4,903.64, there wasn't any damages in there because they couldn't have done it. If there was, it was contrary to the manifest statement of the evidence. But again, I don't know how that number came there. Now, it is true that Ms. Olmstead hired a new person to come in and install flooring. His name was Suttoth. And Mr. Suttoth came in and he gave the conclusionary statement, well, I don't think this flooring was installed in a workable way. That's what he did say. Well, what the record reveals, what the trial testimony indicates is that there was buffling in the flooring. You can see some photographs of that. And there's several different reasons, there's several different causes to primary how that can occur. One is it's a floating floor. And if the contractor takes the floor and runs the flooring right up against the wall, buffling will occur. Aren't all floors floating floors? Your Honor, I'm not enough of a contractor to know, so you're asking the wrong person. And certainly there's no question, and in this case, it was one. And it needed to be done that way. I suppose if it was carpeting, I don't know whether that's floating or not. I don't think it is. Yeah, hardwood floors, I would suspect that's the case. It needs to breathe, is what I understand. It needs to have some room to expand. Well, there was some argument in here also, but I thought you always put the flooring in the house and let it sit for about three days to orientate itself to moisture and temperature. One of the witnesses did indicate that that was an additional reason as to why you could have problems with the flooring. So I guess we've got three. One is improper installation. Two, water gets on the flooring. Three, I suppose in a manifest way to the evidence that that could have been a reason. But if you see, the trial judge doesn't make any findings in that regard as to how it is that she got to her conclusion. But what's the most important point on this is, number one, Mr. Fortmiller testified that he had done this work before. He understood it. And he installed that flooring with an appropriate amount of gap between the edge of the wall and the flooring itself. And then I think my client, Mr. Green, came along, and I think he may have also made a statement to that effect. But Mr. Fortmiller's testimony is by far the most compelling. But it was buckled someplace. There were pictures of buckling. No question that the floor buckled. The point is, who's got the burden of proof on this? This is not a strict liability case. There is a warranty in there. There is a promise in there that this is going to be done in a workmanlike manner. Whether it was in the contract or just implied, it's there. He has to do it in a workmanlike manner. But if you're going to bring a lawsuit and ask for damages because you did it poorly, burden of proof on the homeowner. Okay? So what evidence is there that my client installed, well, the subcontractor installed the flooring in an unworkmanlike manner? So in other words, if it was a workmanlike manner, it wouldn't buckle. Correct. But you're saying also in an unworkmanlike manner, it also, buckling means nothing. Is that what you're saying? What can happen is, there's another reason why the floor buckles. And if you get moisture on the floor, it will buckle. And there was testimony in this case that this home had a couple of dogs, that there had been carpeting there before.  And that testimony was not rebutted. And so we know that there was access to moisture in that manner. And again, the burden of proof isn't on us. The burden of proof is on the party seeking the damages. So there is no evidence. Mr. Suttoth testified that he didn't see the installation. So he doesn't know whether or not Fort Miller did it in a proper way in terms of running it up against the wall or not. Nobody testified that Fort Miller did not let the flooring breathe. No evidence of that. That's the way it is. I guess, given what some of the witnesses said, it could happen. Although even Mr. Suttoth didn't even, who was their primary witness, he didn't even mention a thing about the breathing. Well, now, what's the deal on, there was no play on the ends, that it touched the wall or whatever. Wasn't there some evidence of that? None, Your Honor. I've looked and I've looked, and I don't know how the court may have gotten that impression because I've looked, and I just don't believe there's any evidence that's there. If there was evidence that indicated that, you know, at one end or the other end of the room, that it just ran right up against the wall, then there's no question there is, on a manifest way of the evidence standard, the judgment should be affirmed. So you're not sure you say there's no evidence of that? No evidence at all, Your Honor. The burden of proof was on them, okay? The trial court just can't say, well, Mr. Suttoth testified this was done in an unworkmanlike manner and it didn't work at all. That's the problem that they have with this case. That's, frankly, the reason why we appealed, because I just think it was totally unfair. My client has got a reputation, he tried to do this business, and then to have these kinds of judgments entered against him can be potentially devastating, and that's why he was forced to appeal. In the Cufflin case, which is cited in our brief, kind of a similar sort of case, this court said that in order to get damages for repairs for unworkmanlike performance, the testimony of the plaintiff, the homeowner trying to get the money, has to, in this kind of magic words, has to say these repairs are reasonable and necessary to affect the repair of the job that was done. In this case, no such evidence whatsoever by Mr. Suttoth or anybody that the repairs were reasonable and necessary. Now, another point that needs to be made here is what Ms. Long chose to do is, she chose to just replace the entire flooring. Well, she did not replace the flooring with the same type of quality or anything like that. What she did is she chose to get a completely different kind of flooring, something that I think was more expensive and more durable, and we have no evidence in the record as to what the difference was. In other words, if my client had gone out and done damage to somebody's house, for instance, maybe because of his negligence or otherwise, there was a roof. He didn't force it on putting in a roof, and the roof leaks. And he's got type A quality shingles or whatever they might be. Well, Ms. Long comes along and says, well, I'm going to put a superior grade of shingles on there. Well, my client doesn't have to pay for the difference, right? And that's Ms. Long's burden to show what that difference is and subtract it from the award. And there's no evidence in here as to what that difference was. The trial court doesn't indicate what the difference it was, and the reason the trial court couldn't do that is because there is no evidence as to what the difference was. But I have to believe for some reason that that's also included in this $4,934.64. Now, there's no evidence that's been offered by Mr. Suttles or anybody else that said something like this. The floor buckled in so many different places that the only feasible solution to this problem was to take out the entire floor and put in a new floor, even if it's the same client. No evidence that said, look, it's going to cost $1,000 to patch every one of these holes, and it's cost prohibitive. The most economical solution to this problem is to just remove the entire floor and put in a new entire floor plan. No evidence of that. Was there evidence that that could have been done? What could have been done? Repairs. No. There was no evidence one way or the other. Again, this is not a strict liability case that they're bringing. It's their burden of proof. It's our contention that they have to offer the testimony indicating, look, trying to patch it was not a feasible solution. They didn't even talk about it. Did they even talk about patching? I've read this record very thoroughly. Frankly, it's a very confusing record, Your Honor, because there's four different contracts all being tried at once, and you don't know which testimonies to which contract and the like. But my answer to that is a qualified no. That was not brought into with regard to the flooring, because you had a whole bunch of other testimony about the other issues, which the trial judge didn't give any award for at all. It's my belief that there was no evidence on that point. There was evidence, and the reason I'm not contesting the $500 is because they did bring in a fellow that said, look, they had a photograph of this kitchen cabinet, or I think it was a bathroom cabinet, and it looked like the painting job was substandard, and so he painted it again and did some other work and said the cost was $500. But as to the flooring, there wasn't anything like that. Well, I'm assuming it was some kind of a tongue and groove, or was it a click down or a screw down or a nail down? What kind of flooring was it? Your Honor, when I was in between my senior year of college and first year of law school, I tried to work for a contractor. I lasted about three weeks. He said I made a good effort, and I tried very hard, but I just was totally incompetent and couldn't use it. They probably wouldn't put you on flooring. No, no. I tried to do the roofing, and the shingles were getting, you know. But this wasn't the three-quarter-inch wood nail down. I don't think it was a nail down. They kept talking about laminate, and I think it was half-inch. I think that's what it was, a half-inch laminate, three-quarters-inch laminate. I can go back and look, and on rebuttal I can. They didn't bring that up. Oh, the type of the flooring was, yes, it was discussed at the trial. I'm sure there was testimony. There's even an invoice in there as to type from it. I forget who the contractor was, but there's an invoice in there, and it specifically says the type of flooring that was purchased and the like. So I can give you that information. I just don't have it. Well, it's in the record. But, you know, I'll look for it if it's useful. Now, there was another statement that was made in the appellee's brief, and that statement was made. It says that shortly after the flooring was installed, Ms. Holmes noticed that there was a problem with the installation. That was just a statement that was made. Well, there was no citation to any point in the record to support that. So, again, I went back, and it was unfortunate. We had to do this over a couple different days, and we had three different court reporters, and the number is very confusing. But I went back and I looked. I can't find anything in the record to support that. What I do know is the first contract that Mike filed was in late January. There were three other contracts in about mid-February, and there is testimony in the record that Ms. Holmes started to express her concern in either late April or early May. So there's no question at the time that the flooring was installed, at least in terms of what the record was, Ms. Holmes was very satisfied with it. Both my client and Mr. Fortmiller said that she looked at it and she expressed her, you know, very positive appreciation for it and the like. And that evidence was not rebutted. So on a manifest way to the evidence standard, what I think is very clear is that that flooring was there for a very long period of time before Ms. Holmes started to notice any buckling. If the burden was on us in this case, then we might have it in this case. Thank you. Counsel? May it please the Court, Mr. Holmes? If I could first address Mr. Dunham's confusion regarding the damages awarded by the court. If the court would refer to E-335, there's a receipt from Home Depot for flooring, which equals $2,534. Also, E-334 is the receipt from Ron Suddeth, the person that installed the flooring for Ms. Holmes when she got no response from Mr. Green after years. And that receipt was for $2,400, thereby totaling $4,934, which is where the judge came up with that. We do agree with Mr. Green that the burden is on us, but the standard of proof in front of this appellate court, as you know, is whether or not the evidence, if the judge's ruling was against the manifest weight of the evidence. We don't think that's the case here, Your Honor. More specifically, in the Chicago case, the Chicago franchise, it sets out the standard, which is a judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. In preparing for court today, I did review the trial court's record, and more specifically, the photos that were entered into evidence, including E343, the flooring that was going in the wrong direction, which Mr. Dunham referred to, also the caulking and putty in that photo, E344 and E347, which involved caulking or putty around the toilet, E348 and E349, which involved caulking or putty around the door jams, E350, which is buckling in the middle of a floorboard, E351, buckling and peeling in the middle of another board, E354, where there was too much space between the flooring and walls, and probably most telling of all is E342, where there's buckling throughout the floor that was photographed and admitted into evidence. As set out in the appellant's brief, the flooring installer, Mr. Fortmiller, testified that the flooring would buckle if improperly installed next to the walls without leaving some room for the floor to float, and I think Mr. Dunham would agree with that. But when you look at the evidence and you look at the photos that show caulking and putty between the flooring and the walls, between the flooring and the toilet, between the flooring and the jams, that's where there is no give. That's why you have buckling, and it was almost immediately. There is at least two references to that in the court transcripts. On page 10, in the first part, Ms. Holmes, when asked by Mr. Dunham about the condition of the floor in April 2009, she said the flooring was a big issue. He asked her whether it looked fine. She said in response, in quotes, no, it did not. He asked was there buckling, were those issues presenting themselves as of April. Her answer, they did. When they left the floor, there were places where it did not match, the one where there was a defect in one of the planks, and of course the putty filling in everything with putty. There is another reference on page 36 in part 3 of one of the transcripts when Mr. Dunham again asked when did the buckling start. She said it was almost immediately, and I thought they were going to come back, but Mr. Green never did come back. Instead he sent Mr. Fortmiller, and he was there and noticed the buckling less than three months before the floor was installed. When asked at court whether it looked like water had gotten to it, Mr. Fortmiller said, and it's found on the transcript on page 153, no, just one spot in the hallway where it looked like water had gotten to it. So it wasn't water, it was the installation. Ms. Bones had testified that there were no accidents on the floor, and she also testified on page 36 and 37 of part 3 that Tony Green never came out to look at the floor after the flooring was completed. Mr. Green's hearsay-based summary of Ms. Bones' buckling problem hearsay because it was Mr. Fortmiller that looked at the floor was a summary that dogs or urine had gotten to the floor, even though Ms. Bones testified that there were no accidents, and that the same flooring, which was the surplus flooring ordered on behalf of Ms. Bones, was placed in Mr. Green's mother's bathroom, and there was no problem with moisture in that bathroom. As the court pointed out, I believe that there was an employee from Home Depot, Richard Fraley, who testified that the flooring should have acclimated at least three days in the house. Did Ms. Bones testify to whether or not the floor was acclimated for three days? No. Did she know it was even supposed to be acclimated? No. Was she looking for it? No. So no, she did not testify to that, but the people that did install the floor did not offer that as part of the flooring installation process. Thus, there was no doubt that the buckling was brought about by the defective performance of the appellant. We would agree in Illinois that the measure of damages is the cost of correcting the defective condition, and I think the court asked whether or not there was testimony regarding just some repairs to different spots. Well, if you look at the pictures, the buckling was extensive, the caulking was extensive, the putty. Also, we had Mr. Suttis testify in court that the way you install the floor is to place it down one plank next to the other and then heat them up so they all come one. It wasn't a tongue and groove, and so the installation would have, or the correction would involve the destruction of the entire floor. As a matter of fact, Mr. Green's witness, Mr. Fortmiller, was asked about correcting the flooring in the bathroom, and he testified that it was something that would involve the destruction of the whole floor or something that you couldn't do. The quote exactly is found on page 159. Is it possible that just to remove one or two boards in response to Mr. Dunham's question correcting the problem, Mr. Fortmiller said, no, you would have to take the whole floor? Also, Your Honors, if you remember, Mr. Suttis testified that the whole floor was unsafe. When I asked, was it unsafe for someone of Ms. Ohm's advanced age, he said it was unsafe for anyone. So just a correction was not going to work when you've heated the floor all together, you've caulked around the sides, you've miscalculated the amount of how much flooring, how long the lengths of the planks should be. Mr. Dunham testified, I'm sorry, Mr. Dunham was in the original installation versus the cost by Mr. Suttis. The materials for the installation by Mr. Green totaled $3,388.22, which was more than the cost of the materials when ordered by Mr. Suttis. Was it the same flooring? No. Ms. Ohm's was asked in court whether it was the same flooring. She said no. Would anyone put the same flooring in if you had this horrible result with this floor, this horrible incident or problems with the floor? That doesn't mean the flooring is the problem. Again, it was Mr. Green that brought forth in court evidence that the flooring, if installed correctly, can work when showing evidence that it was installed in his mother's house, but obviously it was not installed correctly when you have problems almost immediately after the installation of the flooring. The cost of repairing the damages or the defective work is the cost of the labor, is the cost of the materials for the flooring in addition to the $500 for the kitchen cabinets and the $1,250 for the cleaning. That was also part of the contract. That was also some of the work that Mr. Green and her house, that was Debbie Bowling, and the evidence was that she paid her $1,250 to clean the house and that was part of the order of the court. The $1,250, the $500 and the labor and materials for Mr. Suttis to repair the floor. Therefore, Your Honor, we do not believe that the court made any error in ordering Mr. Green to pay $6,684.64 to Ms. Owens and we ask that you would affirm the trial court's decision. Thank you. Thank you, Counsel. Counsel? I didn't get a chance to talk about the cleanup. At T-54, the first day of the transcript, Ms. Owens testified that she had to pay $1,250 for cleanup. And then she was asked, well, what kind of a contract did Mr. Green agree to do cleanup? Well, she references a contract that's in the Record 1-D. And what we see is that what he obligated to do was to clean, you know, remove, clean out debris. If you look at the testimony in the transcript on page 37 and 38, it becomes pretty clear that what she did was this lady was a cleaning lady. I think it's pretty obvious. But certainly there wasn't any testimony elicited saying, is this somebody that you paid $1,250 to take all of the debris from the site in the house or out of this house and take it to the dump? There was no testimony about that. And there was no contract where my client indicated that when he left, he was going to give the house a house cleaning. And to what extent the $1,250 is for cleaning the house after the work was done and how much was for cleaning out the debris is just completely unclear. Was there any sawing involved here? Oh, I'm sure there was, yes, Your Honor. And does that make dust? I'm sure it does. And it stays right in that one room and doesn't go in the rest of the house. Oh, I'm sure it does. It doesn't get in the field or the furnace. Even I know that that's the case, Your Honor, as naive as I am. And a reputable contractor is going to do that. The question is, my client shouldn't have to pay for something that's not incidental to the construction. And when you look at the record there, it's very difficult to see how much of that $1,250. Now, with regard to the photographs, I look at the photographs. Certainly the trial court didn't make any finding that the flooring ran right up against the wall. There was no finding like that. And if you look at the photographs that I see, there is some caulking in there. But I see, in fact, one of the great complaints when you look at the photographs is there was a gap between the wall and the flooring was too wide. They thought it was too big. And it just barely was covered over by the molding. That was one of the things that they complained about. So there's no testimony about Well, one, there was no testimony that the flooring ran up against the wall. There was some photographs that showed caulking, but my recollection is that there was a gap between the caulking and the floor everywhere. Well, that shouldn't be done. You shouldn't see that. I don't know. Oh, okay. I guess I was the wrong guy to Well, I mean, you've been in houses. Have you seen it in any other house? Have I seen what? Gaps in caulking? Oh, I wouldn't be happy if it happened in my house. And if I had a contractor that did that, I would want you to fix this. If he didn't fix it, then what I would have to do is I would have to hire somebody to fix it and I would send him a bill for the fix. And if he didn't fix it, then I could take him to small if I was that aggravated about it. But what we have here is that's my obligation to connect the repairs to the problem and then I get the damages. Were any of those photographs not admitted or were they all? They were all. So everything that's in the photograph is admitted. Everything that's in the photograph is admitted. There was no objection to any of those. But the problem with the photographs, Your Honor, is this. You don't know where it is in the house that the photograph relates to. So it might be another room. Another room? The flooring was basically about three quarters of the house. It started from the entryway. Including the bathroom? Including the bathroom. Which gets me. My point is, you look at Mr. Portmiller's testimony and he says, I think it's clear from the context that you're going to have to remove the flooring in the bathroom, not the entire house. Okay? Then do we have anybody testify as to what the cost would be to remove the flooring in the bathroom? What is that number? We don't have any of it. So he didn't testify to removal of flooring where it's buckled. Portmiller, he only testified that he came and looked at it and his was buckling in one spot? There's no question that if you look at the photographs, Your Honor, that there was buckling in different spots in the house. But was it urine spots all over the house? I don't think there's any testimony to that. Okay. Thank you. Thank you, Counsel. We appreciate the briefs and arguments and counsel to take the case under advisement and issue an order in due course.